**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 14-132 |
| | ) | |
| Paris Wilson, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

CONTI, Senior District Judge

## I.    Introduction

In this criminal action, defendant Paris Wilson ("defendant") pleaded guilty to three federal offenses based upon his role in trafficking one kilogram of heroin in the Western District of Pennsylvania. (ECF No. 584 at 1.) In August 2016, the court sentenced defendant and entered a final order of forfeiture with respect to, among other property, $727,456.34 in United States currency that was recovered by law enforcement during and in connection with the execution of a search warrant at a home purchased for defendant's grandmother, Barbara Stegman ("Stegman"), by defendant's father, Harris Wilson ("Wilson").[1] (ECF No. 584.) Wilson claims ownership of the $727,456.34. (ECF No. 627, 628.) For the reasons set forth in these findings of fact and conclusions of law, Wilson satisfied his burden to show that his right to $305,350.00 of the $727,456.34 is superior to defendant's right to that money. Wilson did not satisfy his burden with respect to the remaining $422,196.34. The final order of forfeiture entered in this case on

---

[1] The total of $727,456.34 is comprised of: (1) $521,837.00 found in a home titled in Stegman's name; (2) $188,269.34 seized from Stegman's bank account; and (3) $17,350.00 seized from Stegman's safe deposit box. (ECF No. 584 at 6; ECF No. 540 ¶ 1.)

August 19, 2016, will be vacated and an amended final order of forfeiture will be entered.

## II.     Procedural History

On May 21, 2014, a sealed indictment was filed against defendant and eleven codefendants. (ECF No. 3.) Ten of the defendants were charged with conspiring to possess with intent to distribute one kilogram or more of heroin from in and around October 2013, and continuing thereafter to in and around May 2014, in violation of 21 U.S.C. § 846. (ECF No. 3.) Wilson was also charged with employing a person under the age of 18 years in a drug operation in violation of 21 U.S.C. § 861(a)(1) and (d)(1). (Id.) The indictment provided that the defendants charged with the conspiracy acquired "gross proceeds in United States currency" as a result of the conspiracy, which were subject to forfeiture under 21 U.S.C. § 853(a)(1). (ECF No. 3 ¶ 2.)

On November 6, 2014, the government filed a complaint against the $727,456.34 at civil action number 14-1525 (the "civil case"). In the complaint, the government alleged that Wilson contested the administrative forfeiture proceedings against the $727,456.34. (Civ. Action No. 14-1525, ECF No. 1 ¶ 8.) On January 23, 2015, the court in the civil case approved a stipulation entered into between the government and Wilson to stay the case "until the conclusion of the related criminal case at 14-CR-132 (WDPA) against Paris Wilson…." (Civ. Action No. 14-1525, ECF No. 5 ¶ 2.) The stay included a stay of Wilson's "duty…to file a claim and answer in the event that he wish[ed] to contest…[the] action." (Id.)

On January 27, 2016, the government filed a superseding indictment against Wilson and two of his codefendants. (ECF No. 494.) The superseding indictment charged Wilson with the two counts set forth in the original indictment and added a charge for conspiring to carry and

possess a firearm in relation to and in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(o). (Id.) The superseding indictment contained the same forfeiture allegation set forth in the original indictment with respect to the acquired proceeds as a result of the conspiracy. (Id. at 6.)

On May 2, 2016, defendant pleaded guilty to the three counts with which he was charged in the superseding indictment. (ECF No. 537.) On May 12, 2016, the government filed a motion for forfeiture of property requesting the court to enter a preliminary order of criminal forfeiture with respect to, among other things, the $727,456.34 and that the forfeiture of defendant's right to that money be incorporated into the Judgment at the time of sentencing. (ECF No. 539 at 2.) On May 13, 2016, the court granted the government's motion and entered a preliminary order of forfeiture. (ECF No. 540.) On July 8, 2016, the government filed a declaration of publication in which it represented that the "notice of…forfeiture was posted on an official government internet site…for at least 30 consecutive days, beginning on May 16, 2016 and ending on June 15, 2016." (ECF No. 565.)

On August 19, 2016, the court held a sentencing hearing with respect to defendant. (ECF No. 583.) On the same day the court entered final judgment against defendant and incorporated into that judgment a final order of forfeiture requiring defendant to forfeit his interest in, among other things, $727,456.34 in United States currency. (ECF No. 584 at 6.) On September 7, 2016, the government filed a second declaration of publication in which it represented that the "notice of…forfeiture was posted on an official government internet site…for a least 30 consecutive days, beginning on August 5, 2016 and ending on September 3, 2016." (ECF No. 586.)

On November 27, 2016, Wilson in the civil case filed a motion to lift the stay. (ECF No.

7.) On March 15, 2017, Wilson in this case filed a notice in which he "claim[ed] ownership" of the $727,456.34. (ECF No. 627.) On the same day, Wilson filed a motion for adjudication of his interest ("Wilson's motion") in the $727,456.34. (ECF No. 628.) On March 21, 2017, the court held a conference in both cases during which it set a timeframe for discovery with respect to Wilson's motion and denied Wilson's motion to lift the stay because the forfeiture issues would be handled in the criminal case.

On September 17 and 18, 2018, the court held a bench trial during which the parties introduced evidence, including documents and witness testimony, into the record. (ECF No. 742.) At the conclusion of the bench trial, the court ordered the government and Wilson to file proposed findings of fact and conclusions of law, which they each filed on May 17, 2019. (H.T. 9/18/2018 (ECF No. 756) at 160.)

III.    **Findings of Fact**

**Wilson's Property Purchases**

COL 1.       Wilson's address is 1186 Brintell Street, Pittsburgh, Pennsylvania, 15201 ("Brintell Street home"). (H.T. 9/17/2018 (ECF No. 755) at 5.) Wilson at the time of the hearing had lived at that address for eleven years. (Id.)

COL 2.       Prior to living on Brintell Street, Wilson lived on Franklin Avenue in a home he purchased for Stegman[2] in cash for approximately $40,000.00. (H.T. 9/17/2018 (ECF No. 755) at 74.)

COL 3.       Wilson purchased the house on Brintell Street for Stegman and it is in her

---

[2]      Stegman did not assert a right to any of the money seized by the government in defendant's case. Wilson's counsel originally intended to call Stegman as a witness in the ancillary proceeding. After the court raised issues with respect to the Fifth Amendment to the United States Constitution, (H.T. 9/17/2018 (ECF No. 755) at 220-221), Wilson's counsel did not call Stegman to testify, (H.T. 9/18/2018 (ECF No. 756) at 3).

name. (H.T. 9/17/2018 (ECF No. 755) at 34.) He paid approximately $123,000.00 in cash for the home. (Id. at 35.) He did not have a mortgage. (Id.)

COL 4.    As of the date of the hearing, Stegman still owned the two homes purchased for her by Wilson. (H.T. 9/17/2018 (ECF No. 755) at 75.)

### Wilson's Ticket Reselling Business

COL 5.    Wilson completed the eleventh grade and does not have a high school diploma. (H.T. 9/17/2018 (ECF No. 755) at 5-6.)

COL 6.    He is employed as a ticket broker and a ticket reseller. (H.T. 9/17/2018 (ECF No. 755) at 6.) He has "been doing business" for approximately seventeen years. (Id. at 8.) He has been licensed as a ticket reseller in Pittsburgh, Pennsylvania for approximately fourteen years. (Id.)

COL 7.    He operates his business, which is a sole proprietorship, under the name "Ticket World." (H.T. 9/17/2018 (ECF No. 755) at 6.) Ticket World is run out of Wilson's Brintell Street home. (Id. at 20.)

COL 8.    Prior to operating Ticket World, Wilson sold and used drugs, e.g., marijuana and crack cocaine. (H.T. 9/17/2018 (ECF No. 755) at 13.) He was addicted to crack cocaine for approximately ten years. (Id. at 14.) He has two convictions with respect to selling crack cocaine. (Id.) He served a total of eight years in prison. (Id.)

COL 9.    From 2001 until September 17, 2018, Wilson's only source of income was Ticket World. (H.T. 9/17/2018 (ECF No. 755) at 51-52.)

COL 10.    In 1998, Wilson worked at a fast-food restaurant for seven or eight months and at a movie theater for three months. (H.T. 9/17/2018 (ECF No. 755) at 51-52.) He earned

minimum wage at those jobs. (Id. at 52.)

COL 11.    As of the date of the hearing, Wilson was drug-free for twenty-two years. (H.T. 9/17/2018 (ECF No. 755) at 15.)

COL 12.    Wilson had a ticket reseller license from Nashville, Tennessee that expired in 2011. (H.T. 9/17/2018 (ECF No. 755) at 11.) Wilson testified he had that license to resell tickets for either "a car race or March Madness, which is basketball." (Id.)

COL 13.    Wilson had a ticket reseller license from Indianapolis with an expiration date of 2016. (H.T. 9/17/2018 (ECF No. 755) at 11.) Wilson had that license to sell tickets to the Super Bowl in 2014 or 2015. (Id. at 11-12.)

COL 14.    A ticket broker sells tickets over the internet or telephone. (H.T. 9/17/2018 (ECF No. 755) at 8.) A ticket reseller, which is sometimes referred to as a ticket "scalper," sells tickets "on the streets," i.e., he or she "stand[s] on the street corner…and…sell[s] tickets." (Id. at 8-9, 17.)

COL 15.    Approximately sixty to seventy percent of Wilson's business is ticket reselling on the street. (H.T. 9/17/2018 (ECF No. 755) at 18.) The other thirty to forty percent of the business is online or telephone ticket sales. (Id.)

COL 16.    Wilson does not have any documentation from his "on the street" ticket sales, i.e., any documentation showing how many tickets he sold, the price for which he paid or sold tickets, or for which events he sold tickets. (H.T. 9/17/2018 (ECF No. 755) at 54-55.)

COL 17.    Wilson spends approximately four to five hours on the street reselling tickets for an event. (H.T. 9/17/2018 (ECF No. 755) at 17.)

COL 18.    Wilson as a ticket broker and ticket reseller resells tickets for, among

others, the "Steelers, Penguins, All-Star games, Pitt, Pirates, NASCAR races, Super Bowls, Final Fours, World Series, concerts…." (H.T. 9/17/2018 (ECF No. 755) at 7, 28.) Wilson also resold tickets in 2002 for the Olympics in Utah and for boxing matches held in Las Vegas, Nevada. (<u>Id.</u> at 15.)

COL 19.    Wilson "usually" purchased every year "about a hundred thousand dollars [sic] worth of Steeler tickets[,]" "sixty thousand, seventy thousand" dollars' worth of Pirates tickets, and "thirty, forty thousand" dollars' worth of Penguins tickets. (H.T. 9/17/2018 (ECF No. 755) at 125.)

COL 20.    For a big event, e.g., the Super Bowl, he could spend twelve hours on the street reselling tickets. (H.T. 9/17/2018 (ECF No. 755) at 17.)

COL 21.    Wilson could make "two thousand, three thousand" in profit on one Super Bowl ticket. (H.T. 9/17/2018 (ECF No. 755) at 124.)

COL 22.    Ninety-nine percent of the time, Wilson is paid in cash for reselling tickets on the street. (H.T. 9/17/2018 (ECF No. 755) at 17.) For the other one percent, Wilson permits people he knows to write him a check. (<u>Id.</u> at 17-18.) When Wilson is out of town for a big event, his sales are one-hundred percent cash. (<u>Id.</u> at 18.)

COL 23.    For approximately seventeen years of his career with Ticket World, Wilson would spend approximately sixty to ninety days out of town reselling tickets. (H.T. 9/17/2018 (ECF No. 755) at 15.) More recently, he spends approximately thirty to forty-five days out of town reselling tickets. (<u>Id.</u>)

COL 24.    Wilson incurs expenses for lodging, travel, and food when he is out-of-town for Ticket World. (H.T. 9/17/2018 (ECF No. 755) at 16.)

COL 25.    With respect to Wilson's online ticket sales, he has dealt with two ticket companies, "Lower Level Tickets" and "All-American Tickets." (H.T. 9/17/2018 (ECF No. 755) at 18-19.)

COL 26.    From 2005 to 2013, he did business with Lower Level Tickets, which is owned by Melvin McCormick and located in Dallas, Texas. (H.T. 9/17/2018 (ECF No. 755) at 18.)

COL 27.    From 2013 through 2018, Wilson did business with All-American Tickets, which is half-owned by Rod Schwartz ("Schwartz") and is located in Pittsburgh, Pennsylvania. (H.T. 9/17/2018 (ECF No. 755) at 19, 132.)

COL 28.    Wilson did not have a written contract with Lower Level Tickets. (H.T. 9/17/2018 (ECF No. 755) at 21.) He gave Lower Level Tickets ten percent of his profit on all tickets sold via Lower Level Tickets with the exception of baseball tickets for which Lower Level Tickets would receive thirty-percent of the profit. (Id.)

COL 29.    Wilson and Lower Level Tickets did not exchange tax information. (H.T. 9/17/2018 (ECF No. 755) at 59.)

COL 30.    Lower Level Tickets would sell Wilson's tickets, Wilson would mail the tickets to the customer, and Lower Level Tickets with limited exception would write Wilson a check made out to Stegman or Wilson's girlfriend, Ronetta Waytes ("Waytes"). ((H.T. 9/17/2018 (ECF No. 755) at 21-22.) The checks were made out to Stegman or Waytes because Wilson wanted to avoid paying taxes on his profits.[3] (Id. at 23.)

---

[3]    Wilson testified that he understood that he has a right guaranteed by the Fifth Amendment to the United States Constitution to not incriminate himself, that his testimony could incriminate Stegman, Waytes, McCormick, and himself in federal crimes. (H.T. 9/17/2018 (ECF No. 755) at 24-26.) Wilson chose to proceed and testify despite those understandings. (Id.)

COL 31.     The checks represented the gross proceeds of the ticket sales. (H.T. 9/17/2018 (ECF No. 755) at 62.) Wilson did not have a record to show how much he paid for the tickets. (Id.)

COL 32.     In 2013, Wilson ceased doing business with Lower Level Tickets because they owed him approximately thirty thousand dollars and he was no longer comfortable doing business with the company. (H.T. 9/17/2018 (ECF No. 755) at 26-27.)

COL 33.     Wilson did not have a written contract with All-American Tickets. (H.T. 9/17/2018 (ECF No. 755) at 27.)

COL 34.     After the first year of working with Wilson, All-American Tickets retained ten to thirteen percent of the sale price of Wilson's tickets. (H.T. 9/17/2018 (ECF No. 755) at 27, 129.)

COL 35.     All-American Tickets resold Wilson's tickets via a number of websites, e.g., "Stub Hub," "Tickets Now," and "Vivid Seats." (H.T. 9/17/2018 (ECF No. 755) at 28.)

COL 36.     All-American Tickets paid Wilson via a check made out to him. (H.T. 9/17/2018 (ECF No. 755) at 28.) He deposited the checks into his PNC Bank account. (Id.)

COL 37.     As of the date of the hearing, Wilson resold tickets via All-American Tickets. (H.T. 9/17/2018 (ECF No. 755) at 29.) Most of his business with them took place after the money was seized on May 29, 2014. (Id. at 60.)

COL 38.     From 2014 to approximately 2018, All-American Tickets paid Wilson "[r]oughly" $518,6563.18. (H.T. 9/17/2018 (ECF No. 755) at 130, 138.) All-American Tickets documents all the business it did with Wilson. (Id. at 131.)

COL 39.     Wilson was the largest outside provider of tickets to All-American

9

Tickets. (H.T. 9/17/2018 (ECF No. 755) at 131.) Schwartz described him as reliable, honest, and "on time." (Id.)

COL 40.     All-American Tickets did not provide tax documentation to Wilson. (H.T. 9/17/2018 (ECF No. 755) at 62.)

COL 41.     Ticket World did not have full-time employees. (H.T. 9/17/2018 (ECF No. 755) at 19.) Occasionally Waytes would assist him when he was out-of-town reselling tickets. (Id. at 19-20.)

COL 42.     According to Wilson, he sells "[t]housands" of tickets per year. (H.T. 9/17/2018 (ECF No. 755) at 31.)

COL 43.     He obtains tickets to resell from several sources, including box offices, people he knows, and by placing advertisements in local newspapers. (H.T. 9/17/2018 (ECF No. 755) at 29-31.)

COL 44.     Wilson makes a profit on ticket sales eighty percent of the time. (H.T. 9/17/2018 (ECF No. 755) at 54.) For the other twenty percent, he breaks even or loses money. (Id.)

COL 45.     Wilson does not keep records about how many tickets he sells in a year. (H.T. 9/17/2018 (ECF No. 755) at 31-32.)

**Wilson's Bank Deposits**

COL 46.     From 2005 to 2013, Wilson deposited more than $500,000.00 in checks written to Stegman into her Citizens Bank account. (H.T. 9/17/2018 (ECF No. 755) at 32.) Wilson testified that Stegman and he made the deposits by physically going to the bank and handing the teller cash or a check. (Id. at 33, 89.) He explained that she made sixty percent of the

deposits and he made forty percent of the deposits. (Id. at 33.)

COL 47.    Wilson testified that he also made cash deposits into Stegman's safe deposit box at Citizens Bank. (H.T. 9/17/2018 (ECF No. 755) at 32.) Wilson testified that he could not give an "exact number" with respect to the amount of money he deposited into Stegman's safe deposit box. (Id.) Wilson was a "signator" on the safe deposit box "at the end." (Id. at 33.) In other words, he could enter the safe deposit box without her. (Id. at 33-34.)

COL 48.    Wilson as a "signator" signed an "Acknowledgment of Agent/Deputy[,]" which provided, among other things, that he "shall keep the assets of the principal/renter separate from…[his] assets." (Gov't Ex. 14.)

COL 49.    The documents from Citizens Bank that record persons who accessed Stegman's safe deposit box do not contain any signatures from Wilson. (H.T. 9/17/2018 (ECF No. 755) at 94.)

COL 50.    Wilson testified that he went to Citizens Bank with Stegman to "get cash." (H.T. 9/17/2018 (ECF No. 755) at 94.)

COL 51.    Prior to 2011 or 2012, Wilson deposited "about three hundred thousand" dollars into Waytes' bank account at Dollar Bank. (H.T. 9/17/2018 (ECF No. 755) at 33.)

COL 52.    Wilson was not aware of defendant making deposits into Stegman's bank account or safe deposit box. (H.T. 9/17/2018 (ECF No. 755) at 34.)

### **Wilson's Bank Accounts**

COL 53.    Wilson has a money market account with PNC Bank in which he regularly deposited checks. (H.T. 9/17/2018 (ECF No. 755) at 42-43.) He occasionally deposited cash into that account. (Id. at 43.)

COL 54.    Wilson deposited cash into his checking account. (H.T. 9/17/2018 (ECF No. 755) at 43.) He testified he deposited "eighty, ninety percent of the cash" into his checking account." (Id.)

COL 55.    All the money, whether cash or checks, deposited into the money market account and the checking account is from Wilson's ticket reselling business. (H.T. 9/17/2018 (ECF No. 755) at 43.)

COL 56.    Wilson is the only person with access or signatory authority over the PNC accounts. (H.T. 9/17/2018 (ECF No. 755) at 83.)

COL 57.    As of September 17, 2018, there was $401,000.00 in Wilson's money market account and $8,000.00 or $9,000.00 in his checking account. (H.T. 9/17/2018 (ECF No. 755) at 43.)

**<u>Wilson Stored Cash at the Brintell Street Home</u>**

COL 58.    Beginning in February 2001, Wilson kept cash derived from ticket reselling at the Brintell Street home. (H.T. 9/17/2018 (ECF No. 755) at 43-44.) He stored the cash at the home because he did not want to pay taxes on it. (Id. at 45.)

COL 59.    Wilson knew that if he deposited the money at a bank, he could earn interest on the money. (H.T. 9/17/2018 (ECF No. 755) at 98.)

COL 60.    He kept the cash in the basement, his room, and "in the dishwasher that wasn't working." (H.T. 9/17/2018 (ECF No. 755) at 44.)

COL 61.    He first kept "a couple thousand dollars" in his home and "every year it was just more and more." (H.T. 9/17/2018 (ECF No. 755) at 44.) Beginning in 2002, he stored at least $50,000.00 to $60,000.00 in the home. (Id. at 44-45.)

COL 62.     He let ninety percent of the funds accumulate, i.e., he did not use approximately ninety percent of the cash stored at the home. (H.T. 9/17/2018 (ECF No. 755) at 44.)

### Wilson's Expenses

COL 63.     In 2013, Wilson purchased a 2013 Range Rover for $102,000.00. (H.T. 9/17/2018 (ECF No. 755) at 37-38.) He traded in a 2007 Range Rover and received $30,000.00 toward the purchase price of the 2013 vehicle. (Id. at 38.) He paid the balance in cash. (Id.) The Ranger Rover is registered in Waytes' name.[4] (Id.)

COL 64.     In 2014, Wilson purchased a 2010 Mercedes for Waytes for approximately $42,000.00. (H.T. 9/17/2018 (ECF No. 755) at 36-37.) The vehicle is registered in her name. (Id. at 37.) Wilson took a loan to pay for the vehicle, which was satisfied in May 2018. (Id. at 38.)

COL 65.     From approximately 2016 through 2018, Wilson paid all the expenses, e.g., tax, gas, cable, electric, water, alarm company, home warranty, and insurance bills, incurred at the Brintell Street home. (H.T. 9/17/2018 (ECF No. 755) at 75-76.) He paid for approximately ninety percent of the food for the home. (Id. at 76.)

COL 66.     Prior to 2016, Wilson "split the bills…sixty-forty" with Stegman and his step-dad. (H.T. 9/17/2018 (ECF No. 755) at 77.)

COL 67.     Wilson pays $320.00 per month for cellular telephones for Stegman, his stepdaughter, and himself. (H.T. 9/17/2018 (ECF No. 755) at 77.)

COL 68.     Wilson pays $514.00 per month for health insurance. (H.T. 9/17/2018 (ECF No. 755) at 78.)

---

[4]     The Range Rover is registered to Waytes because Wilson does not have a driver's license. (H.T. 9/17/2018 (ECF No. 755) at 80.)

COL 69.     Wilson paid for his vehicles and all his bills from the proceeds of his ticket selling business. (H.T. 9/17/2018 (ECF No. 755) at 78, 80.)

COL 70.     Wilson has two credit cards. (H.T. 9/17/2018 (ECF No. 755) at 81.)

COL 71.     He makes personal purchases on the credit cards, e.g., paying for personal trips, dinners, and clothing. (H.T. 9/17/2018 (ECF No. 755) at 82.)

**Wilson's Tax Returns**

COL 72.     Wilson's accountant is Larra Daniels ("Daniels"). (H.T. 9/17/2018 (ECF No. 755) at 20.)

COL 73.     During discovery with respect to this forfeiture proceeding. Wilson provided the government tax returns for the years 2011 through 2016. (H.T. 9/17/2018 (ECF No. 755) at 50.)

COL 74.     In 2014, Daniels prepared the tax returns provided to the government. (H.T. 9/17/2018 (ECF No. 755) at 50.)

COL 75.     Wilson has never filed a tax return with the government. (H.T. 9/17/2018 (ECF No. 755) at 50, 63.)

COL 76.     For 2011, Wilson's tax return provided that: (a) his total income was $90,396.00 (H.T. 9/17/2018 (ECF No. 755) at 65); (b) his business gross receipts were $310,000.00 (id. at 67); and (c) his cost of goods sold was $203,594.00 (id. at 68). Wilson owed $25,859.00 in taxes on his total income. (Id. at 66.) Wilson did not provide Daniels documentation for the foregoing dollar amounts. (Id.) The 2011 tax return was never filed with the government, and Wilson did not pay taxes on income earned in 2011. (H.T. 9/17/2018 (ECF No. 755) at 67.) Wilson did not have documentation to support the estimates he provided to

Daniels for the 2011 tax return. (Id. at 68.)

COL 77.    For 2012, Wilson's tax return provided that: (a) his total income was $60,664.00 (H.T. 9/17/2018 (ECF No. 755) at 69); (b) he owed $14,798.00 in taxes on that income (id.); (c) his business gross receipts were $295,000.00 (id. at 70); and (d) the cost of goods sold was $223,594.00 (id.). Wilson did not have documentation to support the estimates he provided to Daniels for the 2012 tax return. (Id. at 70.) Wilson testified that he instructed Daniels to file the 2012 tax return. (Id.) Wilson, however, did not pay $14,798.00 to the government, which he owed for the taxes. (Id.)

COL 78.    For 2013, Wilson's tax return provided that: (a) his total income was $69,026.00 (H.T. 9/17/2018 (ECF No. 755) at 71); (b) he owed $18,947.00 on that income (id.); (c) his business gross receipts were $330,00.00 (id. at 72); and (d) the cost of goods sold was $245,170.00 (id.).

COL 79.    For 2014, Wilson's tax return provided that: (a) his total income was $68,286.00 (H.T. 9/17/2018 (ECF No. 755) at 73); (b) he owed $19,707.00 in taxes on that income (id. at 73); (c) his business gross receipts were $288,00.00 (id. at 74); and (d) the cost of goods sold was $195,300.00 (id. at 74).

COL 80.    Wilson did not have documentation to support the estimates he provided to Daniels for the tax returns dated 2011-2014. (H.T. 9/17/2018 (ECF No. 755) at 67-68, 70, 72, 74.) He testified that he instructed Daniels to file the tax returns. (Id. at 69, 70, 71, 73.) Wilson, however, did not pay taxes to the government for the amounts due on the tax returns from 2011 through 2014. (Id. at 69, 70, 71, 73.) Daniels testified that it was Wilson's responsibility to file the tax returns and that she explained that responsibility to him. (H.T. 9/18/2018 (ECF No. 756)

at 15.) Daniels provided Harris an addressed envelope for him to file the tax returns. (Id.)

### Defendant's Narcotics Activity

COL 81.    Defendant lived at the Brintell Street home in 2013. (H.T. 9/17/2018 (ECF No. 755) at 38-39.)

COL 82.    At some point in 2013, Wilson learned "through a couple friends" that defendant was selling drugs. (H.T. 9/17/2018 (ECF No. 755) at 40.) Wilson could also tell from defendant's behavior that he was selling drugs. (Id.)

COL 83.    Wilson at that time did not know the kind or quantity of drugs defendant was selling. (H.T. 9/17/2018 (ECF No. 755) at 40.)

COL 84.    Two months later, Wilson told defendant to leave the home because he was "doing activity that…[Wilson didn't] like, which…[was] selling drugs." (Id.)

COL 85.    The day after Wilson told defendant to leave the Brintell Street home, Wilson found heroin in the house. (H.T. 9/17/2018 (ECF No. 755) at 41-42.)

COL 86.    Defendant testified, however, that he "never stored anything at Brintell Street." (H.T. 9/18/2018 (ECF NO. 756) at 99.)

COL 87.    After defendant left the Brintell Street home, "he lived all over," i.e., "[d]ifferent people's houses, different females, friends, hotels…." (H.T. 9/17/2018 (ECF No. 755) at 40, 175.)

COL 88.    Defendant, however, would visit Stegman at the Brintell Street home. (H.T. 9/17/2018 (ECF No. 755) at 40.)

COL 89.    Defendant testified that after Wilson kicked him out of the Brintell Street home, he "never stayed not one night there." (H.T. 9/18/2018 (ECF No. 756) at 111.)

COL 90.     Wilson did not permit defendant to store drugs at the Brintell Street home. (H.T. 9/17/2018 (ECF No. 755) at 40.)

COL 91.     Wilson was not aware of defendant hiding cash at the Brintell Street home. (H.T. 9/17/2018 (ECF No. 755) at 42.)

COL 92.     Defendant testified that he did not hide money at the Brintell Street home. (H.T. 9/17/2018 (ECF No. 755) at 181.)

COL 93.     Defendant sold heroin for approximately three to four years. (H.T. 9/17/2018 (ECF No. 755) at 176, 190.)

COL 94.     From 2010 through 2012, defendant lived at the Brintell Street home and sold heroin. (H.T. 9/17/2018 (ECF No. 755) at 191.)

COL 95.     Defendant testified that he spent all the money he made from selling drugs going to nightclubs, on vacations, and buying clothes. (H.T. 9/17/2018 (ECF No. 755) at 177.) In other words, he did not accumulate or save any money during that period of time. (Id. at 178.)

COL 96.     He took approximately fifteen to twenty vacations during the three- to four-year period during which he sold heroin. (H.T. 9/17/2018 (ECF No. 755) at 177, 190.)

COL 97.     Defendant did not have any knowledge about Stegman's Citizens Bank account or safe deposit box. (H.T. 9/17/2018 (ECF No. 755) at 181, 183.)

COL 98.     On June 2, 2014, defendant first learned from Wilson about Stegman's bank account and safe deposit box prior to defendant turning himself in to federal authorities in this case. (H.T. 9/17/2018 (ECF No. 755) at 183.)

COL 99.     Defendant never deposited any money in a bank account or safe deposit box. (H.T. 9/17/2018 (ECF No. 755) at 182.)

COL 100.    Defendant did not provide Stegman money to deposit in her bank account or safe deposit box. (H.T. 9/17/2018 (ECF No. 755) at 182.)

### The Government's Surveillance of Defendant

COL 101.    Christopher Minton ("Minton") is a law enforcement officer with the Borough of Wilkinsburg Police Department and a Task Force Officer with the Federal Bureau of Investigation ("FBI") assigned to the Safe Streets Task Force. (H.T. 9/18/2018 (ECF No. 756) at 30-31.)

COL 102.    In late 2009, Minton initiated an investigation of the "Bricks R Us" drug distribution network. (Id. at 67.)

COL 103.    The FBI became involved with the investigation. (H.T. 9/18/2018 (ECF No. 756) at 120.) Aaron Francis ("Francis") was the lead FBI agent in the investigation. (Id. at 117, 120.) Minton and Karen Springmeyer, a special agent for the FBI, were Francis' co-agents in the investigation. (Id. at 120.)

COL 104.    The investigation utilized the following techniques: confidential informants; controlled narcotics purchases; surveillance; search warrants; and "Title III wiretaps[.]"[5] (H.T. 9/18/2018 (ECF No. 756) at 121.)

COL 105.    The initial investigation targeted three individuals: Dominique Harvey ("Harvey"); Terell Evans ("Evans"); and Homer McClelland ("McClelland"). (Id. at 67.)

COL 106.    In January 2014, defendant became a target of the investigation. (H.T. 9/18/2018 (ECF No. 756) at 67.) Three of defendant's telephones were intercepted as part of the investigation. (Id. at 122.)

---

[5]    The first wiretaps were utilized on December 26, 2013. (H.T. 9/18/2018) (ECF No. 756) at 121.)

COL 107.    At the conclusion of the investigation, forty-five people were federally indicted. (H.T. 9/18/2019 (ECF No. 756) at 121.)

COL 108.    On April 14, 2014, at 10:27 a.m., defendant had a telephone conversation with Benton Nixon ("Nixon"), one of his codefendants in this case to whom he supplied heroin. (Gov't Ex. 84.) The conversation in pertinent part, provided:

BN: What you say?

PW: A deuce. For these, u, I got, Bugatti's, Magic City's, and Fuck that Bitch, they're all from the same person, and Medusas,[6] you ever hear of any of them?

BN: Nah, not for real but I'm butt right now, U/I, my little situation U/I and shit, dog, they are alright though?

PW: Yea, I, I, I ain't on no, just a deuce.

…

PW: You can come, I'm about, I about to, I'm grabbing today so, like, if you wanted, I don't know, it's up to you.

BN: Ok, I'm about drive U/I real quick dog. I'm gonna hit you in like, where you gonna be at in like 20 minutes?

PW: Uh, I don't know, just, just, just call, just call me soon as you ready, but like U/I, cuz I ain't trying to leave, I'm just gonna run to Ross Park, and then by that time you should be, you know what I'm saying.

BN: Alright.

(Gov't Ex. 84.)

COL 109.    Francis interpreted the above-quoted call to mean that defendant was going to purchase heroin from his supplier and sell it to Nixon for $200.00 per brick. (H.T. 9/18/2018 (ECF No. 756) at 126.)

COL 110.    On the same day, Minton received instructions to surveil defendant who

---

6    Francis testified that "Bugatti's, Magic City's,…Fuck that Bitch,…and Medusas" were names of stamp bags of heroin. (H.T. 9/18/2018 (ECF No. 756) at 125; Gov't Ex. 84.)

was located at Ross Park Mall. (H.T. 9/18/2018 (ECF No. 756) at 35.)

COL 111.    Defendant left Ross Park Mall and traveled to the "North Side section of the City of Pittsburgh…near Middle Street and East Ohio Street." (H.T. 9/18/2018 (ECF No. 756) at 35.)

COL 112.    Minton observed defendant in a dark colored minivan with a North Carolina license plate. (H.T. 9/18/2018 (ECF No. 756) at 36, 47.) Nixon approached the minivan and gave defendant a white bag with red writing on it. (Id. at 36, 58.)

COL 113.    Francis described Nixon as follows: "Benton was supplied heroin by Paris Wilson. Benton Nixon would then distribute that heroin to end-users." (H.T. 9/18/2018 (ECF No. 756) at 124.)

COL 114.    At approximately 12:30 p.m., defendant traveled in the minivan to the Brintell Street home. (H.T. 9/18/2018 (ECF No. 756) at 36.)

COL 115.    Defendant then left the Brintell Street home and got into driver's side of the minivan while carrying a white bag with red writing on it. (H.T. 9/18/2018 (ECF No. 756) at 37, 39; Gov't Ex. 31.)

COL 116.    Minton and his surveillance team believed there was money inside the bag. (Id. at 38.) Minton explained that based upon his training and experience with narcotics trafficking he believed there was "stacked, blocked money" in the bag. (Id.)

COL 117.    Defendant testified that there was money in the white bag with red writing and the money came from his drug sales. (H.T. 9/18/2018 (ECF No. 756) at 101-02, 113.)

COL 118.     Wilson entered the passenger side of the minivan with defendant. (H.T. 9/18/2018 (ECF No. 756) at 39.)

COL 119.     Defendant drove the minivan and dropped Wilson off in the East Liberty section of the City of Pittsburgh. (H.T. 9/18/2018 (ECF No. 756) at 39-40.)

COL 120.     Minton's surveillance team followed defendant to the Northern Pike Garden Park apartments in Monroeville, Pennsylvania.[7] (H.T. 9/18/2018 (ECF No. 756) at 40.)

COL 121.     Defendant met McClelland at the apartments. (H.T. 9/18/2018 (ECF No. 756) at 41.)

COL 122.     Defendant next traveled in the minivan to the Swissvale section of the City of Pittsburgh to the "Fish, Chicken 'n More" restaurant. (H.T. 9/18/2018 (ECF No. 756) at 42.)

COL 123.     Prior to defendant's arrival at the restaurant, Minton's surveillance team observed Bell who was also being investigated for his role in "Bricks R Us," at the restaurant. (H.T. 9/18/2018 (ECF No. 756) at 42-43.) Bell exited the restaurant with a white bag and placed the bag on the backseat of a tan-colored Dodge Ram truck. (Id. at 43.)

COL 124.     On April 14, 2014, at 1:23 p.m., Wilson texted Bell "90 how long[.]" (Gov't Ex. 86; H.T. 9/18/2018 (ECF No. 756) at 128.) Francis interpreted the text message to mean that defendant wanted "to purchase ninety bricks of heroin and is inquiring when can they meet." (H.T. 9/18/2018 (ECF No. 756) at 128.)

COL 125.     At 3:13 p.m., Bell responded: "My fault 45 min[.]" (Gov't Ex. 87.)

COL 126.     At 3:56 p.m., Bell texted defendant: "I'm here[.]" (Gov't Ex. 88.) At the same time, defendant texted Bell: "15 min[.]" (Gov't Ex. 89.)

COL 127.     At 4:51 p.m., Bell sent defendant the following text message:

---

[7]     Defendant at one point in time lived at the Northern Pike Garden Apartments with Terrell Evans. (H.T. 9/18/2018 (ECF No. 756) at 59.) Defendant, however, had a "falling out of some sort" and did not trust staying at the apartment with Evans. (Id.) Minton believed defendant moved out of the apartment was staying at the Brintell Street home. (Id.)

Pull up next to the truck n switch bags.urs is on the drivers. Back seat[.]

(Gov't Ex. 90; H.T. 9/18/2018 (ECF No. 756) at 102.)

COL 128.    Defendant arrived at the restaurant and parked next to the Dodge Ram truck. (H.T. 9/18/2018 (ECF No. 756) at 43.) Minton explained:

> A progression of things happened at this point in time. Paris Wilson exited his van, and went to the passenger side of the Dodge Ram, opened that back door, placed a bag, the white bag from the previous photo at 1186 Brintell with the cash in it, placed that in the rear passenger seat of the Dodge Ram. Once he did this, he then closed that door, walked around the rear of the Dodge Ram, opened the back door, back driver's side door now, of the Dodge Ram and removed another white bag with red writing.

(H.T. 9/18/2018 (ECF No. 756) at 44; Gov't Exs. 39-47.)

COL 129.    On April 15, 2014, Minton conducted surveillance of defendant. (H.T. 9/18/2018 (ECF No. 756) at 47.)

COL 130.    Minton again observed defendant at Ross Park Mall with the minivan. (H.T. 9/18/2018 (ECF No. 756) at 47.)

COL 131.    At 1:47 p.m., Salah Tinsley-Ewell ("Tinsley-Ewell"), another person charged and convicted in the above-captioned case who purchased heroin from defendant to sell to end-users, called defendant and inquired about his location. (Gov't Ex. 91; H.T. 9/18/2018 (ECF No. 756) at 48, 131.) Defendant asked Tinsley-Ewell "what's the deal[?]" (Gov't Ex. 91.) Tinsley-Ewell responded: "16[.]" (Id.) Francis interpreted "16" as $16,000.00 in cash. (H.T. 9/18/2018 (ECF No. 756) at 133.) At 1:50 p.m., defendant confirmed "16" in a text message to Tinsley-Ewell and wrote: "cuz I'm about to text him." (Gov't Ex. 92.)

COL 132.    Defendant traveled from Ross Park Mall to the East Liberty section of the City of Pittsburgh to a store named "Social Status." (H.T. 9/18/2018 (ECF No. 756) at 47.)

COL 133.     At the store, defendant met with Tinsley-Ewell. (H.T. 9/18/2018 (ECF No. 756) at 48, 131.)

COL 134.     Defendant left the store carrying a black bag. (H.T. 9/18/2018 (ECF No. 756) at 48.)

COL 135.     Defendant did not remember bringing drugs or money into the store or taking drugs or money from the store. (H.T. 9/18/2018 (ECF No. 756) at 112.-13.)

COL 136.     Defendant traveled in the minivan to the Brintell Street home and entered the home. (H.T. 9/18/2018 (ECF No. 756) at 48.)

COL 137.     At 2:33 p.m., defendant—while at the Brintell Street home—called Jarran Bell ("Bell") from whom he purchased large amounts of heroin. (Gov't Ex. 93; H.T. 9/18/2018 (ECF No. 756) at 137; H.T. 5/2/2016 (ECF No. 626) at 21-24.) Defendant stated, among other things, "I'm bout to text you right now." (Id.)

COL 138.     At 2:36 p.m., defendant texted Bell: "180 can you do it for 150." (Gov't Ex. 94.) Francis explained: "Paris Wilson is telling Jarran Bell that he wants a hundred eighty bricks and asking if he can pay a hundred and fifty dollars per brick." (H.T. 9/18/2018 (ECF No. 756) at 134.) Bell responded: "175 the lowest." (Gov't Ex. 96.) Defendant replied: "Ok how long[.]" (Gov't Ex. 97.) Bell answered: "40[.]" (Gov't Ex. 98.)

COL 139.     Defendant eventually exited the Brintell Street home with a dark colored duffel bag[8] and entered the minivan.[9] (H.T. 9/18/2018 (ECF No. 756) at 49, 137-38.)

---

[8]     Minton did not know if the black duffel bag carried by defendant when he exited the Brintell Street home was the same bag black bag defendant carried when he exited Social Status. (H.T. 9/18/2018 (ECF No. 756) at 76.)

[9]     At 2:55 p.m., Wilson called Shawn Ellis ("Ellis") another person to whom he sold heroin to sell to end-users. (Gov't at 95; H.T. 9/18/2018 (ECF No. 756) at 135.) Ellis told defendant he

COL 140.    At 3:56 p.m., defendant called Bell and stated "I'm 10 minutes away." (Gov't Ex. 100.)

COL 141.    Defendant traveled to Fish, Chicken 'n More where he entered the restaurant. (H.T. 9/18/2018 (ECF No. 756) at 50.)

COL 142.    At 4:31 p.m., defendant texted Bell "Here[.]" (Gov't Ex. 101.)

COL 143.    While defendant was inside the restaurant, Bell arrived at the parking lot of the restaurant in the Dodge Ram truck with Krystal Baretto ("Baretto"), who was also charged with federal narcotics violations, in the passenger seat. (H.T. 9/18/2018 (ECF No. 756) at 49; Gov't Ex. 52.)

COL 144.    Bell pulled the Dodge Ram truck next to defendant's minivan. (H.T. 9/18/2018 (ECF No. 756) at 50; Gov't Ex. 54.)

COL 145.    Minton explained what happened next:

Once the truck is fully backed in and the occupants, Jarran Bell's approaching Paris Wilson's van, but, ultimately, our view is obstructed. They had a tarp of some sort that they, that Krystal and Jarran pull out of the back of the truck. And at that point in time, surveillance cannot observe what is taking place in between the van and the truck.

(H.T. 9/18/2018 (ECF No. 756) at 51; Gov't Ex. 55.)

---

was going to meet with a heroin user named "Bobby." (Gov't at 95; H.T. 9/18/2018 (ECF No. 756) at 135.) Ellis told defendant he had "bread" on his person. (Gov't 95.) Francis explained that meant "Ellis had cash to give to…[defendant] for supplied heroin." (H.T. 9/18/2018 (ECF No. 756) at 136.) Francis described Ellis' relationship to defendant as follows:

[H]e wasn't an end-user. He was more of a runner. So, he would hold the large quantities of heroin for Paris. Paris would receive calls from his customers in Kittanning and Armstrong County area. Paris would direct them where to go. He would then contact Shawn Ellis who would deliver the heroin.

(H.T. 9/18/2018 (ECF No. 756) at 157.) In other words, Ellis did not have his own customers. (Id.) The price for heroin from Ellis to the end-user would be much higher than $200.00 a brick, e.g., $300.00 to $350.00 per brick. (Id. at 156-57.) Miranda Rosenberger also operated as a runner for defendant. (Id. at 157-58.)

COL 146.     Approximately four minutes after he entered the restaurant, defendant exited the restaurant and drove away in the minivan. (H.T. 9/18/2018 (ECF No. 756) at 52.) Defendant was not observed eating in the restaurant or exiting the restaurant with a take-out order. (Id.)

COL 147.     On April 15, 2014, at 9:26 p.m., Linton called defendant and told him "think I got like 40 left[,]" meaning he had forty bricks of heroin left. (Gov't Ex. 102; H.T. 9/18/2018 (ECF No. 756) at 141.) Defendant responded "I need all of that." (Gov't Ex. 102.)

COL 148.     On April 16, 2014, Minton conducted surveillance of defendant. (H.T. 9/18/2018 (ECF No. 756) at 52.)

COL 149.     The surveillance of defendant began at the Brintell Street home. (H.T. 9/18/2018 (ECF No. 756) at 53.)

COL 150.     At 11:43 a.m. defendant and Linton had a telephone call. (H.T. 9/18/2018 (ECF No. 756) at 109; Gov't Ex. 103.) The following conversation took place:

QL (Talking to someone else): I'm U/I the house, I'll text you in like a little bit.

PW: Bro.

QL (Talking to someone else): U/I

PW: Bro

QL (Talking to someone else): I got you, alright I got you.

QL: Hello

PW: Yeah bro, uh, where, where you want me to come to?

QL: Meet me at the same spot.

PW: Uh, I don't even remember.

QL: remember we went to the little food place first, that's where homey met you

at, and then we went around the corner?

PW: Yeah, I got mad other shit on me though, could you, any way you could go

to Edgewood U/I?

QL: Oh, Edgewood, yeah alright, I'll do that.

PW: How long? Cuz I'm ready when U/I

QL: Uh, uh, give me, I'll be in Edgewood in about 20 minutes.

PW: alright that's cool.

QL: Alright

(Gov't Ex. 103.)

COL 151.    Defendant was at the Brintell Street home at the time of the foregoing

telephone call. (H.T. 9/18/2018 (ECF No. 756) at 141-42.)

COL 152.    Defendant traveled in the minivan from the Brintell Street home to

Edgewood Towne Center. (H.T. 9/18/2018 (ECF No. 756) at 53.)

COL 153.    At 12:27 p.m., Linton called defendant and asked him "you on the top or

the bottom?" (Gov't Ex. 104.) Wilson responded: "I'm at the top." (Id.)

COL 154.    Defendant met Linton at Edgewood Towne Center. (H.T. 9/18/2018 (ECF

No. 756) at 54.)

COL 155.    Linton pulled his Chevrolet vehicle in close proximity to defendant's

minivan. (H.T. 9/18/2018 (ECF No. 756) at 54.)

COL 156.    Defendant walked over to Linton's vehicle and enters the passenger seat.

(H.T. 9/18/2018 (ECF No. 756) at 54.) Linton drove around the parking lot of Edgewood Towne

26

Center. (Id. at 54-55.) Neither Linton nor defendant entered any stores. (Id. at 55.)

COL 157.     Linton drove the vehicle to its original parking spot in Edgewood Towne Center. (H.T. 9/18/2018 (ECF No. 756) at 55.)

COL 158.     Defendant exited Linton's vehicle carrying "a big satchel bag, a large paper bag, a clothing bag, that said Social Status on the side of it." (H.T. 9/18/2018 (ECF No. 756) at 55; Gov't Ex. 61.)

COL 159.     Defendant got into his minivan and drove to an Exxon Gas Station in Wilkinsburg, Pennsylvania to meet Nixon. (H.T. 9/18/2018 (ECF No. 756) at 56-57.)

COL 160.     Minton believed during the three days he surveilled defendant in April 2014, defendant was living at the Brintell Street home. (H.T. 9/18/2018 (ECF No. 756) at 59.) He explained:

> [Defendant] went there. He had free access to…[the Brintell Street home]. He was not staying at his apartment in Monroeville. So, at that point in time, my belief is he was staying at 1186 Brintell in April.

(H.T. 9/18/2018 (ECF No. 756) at 77.) Minton also testified that during the three days in April 2014 during which he surveilled Wilson, a "tan-ish color Cadillac that was registered to…[defendant] or by Melvin Moore, another conspirator" was parked at the Brintell Street home. (Id. at 78.)

COL 161.     Based upon the investigation of defendant on April 14, 15, and 16, 2014, Francis concluded that defendant used the Brintell Street home to stash money. (H.T. 9/18/2018 (ECF No. 756) at 145.)

COL 162.     In April 2014, the street value of a brick of heroin was approximately $130.00 to $150.00. (H.T. 9/18/2018 (ECF No. 756) at 79.)

COL 163.     A person reselling a brick of heroin could sell it for twice what he or she

paid for it. (H.T. 9/18/2018 (ECF No. 756) at 80.) In other words, a "typical" price for a brick of

heroin being resold would be $260 to $300. (Id.) Depending on the area, a person could sell a

brick of heroin for $500.00. (Id.)

COL 164.     Defendant appeared in a music video for Harvey, which was posted on

YouTube. (H.T. 9/18/2018 (ECF No. 756) at 150.) In the music video, Harvey wore a t-shirt that

said "A hundred bricks at a time." (Id.) According to Francis, various members of Bricks R Us,

including defendant, wore similar t-shirts. (Id. at 150-51.) In the music video, defendant wore a t-

shirt that had his nickname "Kittanning Mike" on the sleeve. He used that name when he sold

heroin to users (Id. at 132, 151.)

### The Search of the Brintell Street Home

COL 165.     In the early hours of May 29, 2014, federal agents with firearms came to

execute a search warrant at the Brintell Street home.[10] (H.T. 9/17/2018 (ECF No. 755) at 45;

H.T. 9/18/2018 (ECF No. 756) at 145.)

COL 166.     The federal agents banged on the door. (H.T. 9/17/2018 (ECF No. 755) at

45.) Wilson opened the door. (Id.)

COL 167.     On that day, Wilson, Stegman, Wilson's stepfather, and Wilson's brother

lived at the Brintell Street home. (H.T. 9/17/2018 (ECF No. 755) at 46.) Waytes did not live at

the home, but was staying with Wilson on that day. (Id.)

COL 168.     The federal agents moved all the occupants of the home into the living

room. (H.T. 9/17/2018 (ECF No. 755) at 46.)

---

[10]     The Brintell Street home was one of twelve locations searched on May 29, 2014, as part
of the Bricks R Us investigation. (H.T. 9/18/2018 (ECF No. 756) at 145.)

COL 169.     The federal agents during the search found "[l]arge amounts of cash, a firearm, some bank records, and safe deposit box key." (H.T. 9/18/2018 (ECF No. 756) at 146; Gov't Exs. 69-83.)

COL 170.     A bank record in Stegman's name was found during the search. (H.T. 9/18/2018 (ECF No. 756) at 148.) It showed "[b]etween a hundred and a hundred and eight thousand dollars" in the account. (Id.)

COL 171.     A safe deposit key to Stegman's Citizens Bank safe deposit box was also found during the search. (H.T. 9/18/2018 (ECF No. 756) at 149.)

COL 172.     The federal agents permitted Wilson to show them where he hid the cash in the home. (H.T. 9/17/2018 (ECF No. 755) at 47.) Wilson took them to the basement and to his bedroom. (Id. at 48.) He showed them everywhere he hid the money with the exception of the dishwasher. (Id.) The federal agents found $83,610.00 stored in the dishwasher on their own. (Id. at 48, 95.)

COL 173.     The "bulk" of the money was in the basement and the "other bulk of the money" was in Wilson's bedroom. (H.T. 9/17/2018 (ECF No. 755) at 95.)

COL 174.     Wilson testified that he "didn't keep stuff in the dishwasher…[and] [t]hat money probably been sitting there since the dishwasher was there." (H.T .9/17/2018 (ECF No. 755) at 97.)

COL 175.     Cash was found in Wilson's bedroom in various locations. (H.T. 9/17/2018 (ECF No. 755) at 95.) The federal agents found $100,000.00 among five boxes containing bobblehead dolls of a Pittsburgh Pirate baseball player. (Id.; Gov't Exs. 79-80.) Money was also found stuffed in a pair of boots and in various articles of clothing. (Id. at 96;

Gov't Ex. 77-78, 81-83.)

COL 176.    Cash was found, among other places:

-   between a mattress and box spring (H.T. 9/18/2018 (ECF No. 756) at 146; Gov't Ex. 70);

-   inside a black duffel bag placed inside a large blue container in the proximity of a Pittsburgh Pirates stuffed animal (H.T. 9/18/2018 (ECF No. 756) at 146; Gov't Ex. 71);

-   inside a large garbage bag placed inside a large blue container in the proximity of a Pittsburgh Pirates stuffed animal and a picture of a baseball stadium (H.T. 9/18/2018 (ECF No. 756) at 146-47; Gov't Ex. 72);

-   laying on top of an envelope, with defendant's name and "Brintell Street, Pittsburgh, Pennsylvania" as the return address (H.T. 9/18/2018 (ECF N0. 756) at 147; Gov't Ex. 73.);

-   on top of two greeting card envelopes with the writing "Love you From Paris" on the front of one of the envelopes (Gov't Ex. 76);

-   inside the pockets of a jacket (H.T. 9/18/2018 (ECF No. 756) at 148; Gov't Exs. 81-82); and

-   inside a pair of jeans (H.T. 9/18/2018 (ECF No. 756) at 148; Gov't Ex. 83);

COL 177.    Wilson "showed the agents a bunch of places in…[his] room where…[he] had money." (H.T. 9/17/2018 (ECF No. 755) at 96.)

COL 178.    Wilson did not know what the federal agents were looking for in the home. (H.T. 9/17/2018 (ECF No. 755) at 48.) He, however, wanted them to know that the money hidden in the home belonged to him. (Id. at 47-48.)

COL 179.    Wilson asked the federal agents why they were taking his money and for a receipt for the money. (H.T. 9/17/2018 (ECF No. 755) at 48.)

COL 180.    The federal agents obtained seizure warrants for Stegman's Citizens Bank account and safe deposit box. (H.T. 9/18/2018 (ECF No. 756) at 149.) Those warrants were

executed same day, i.e., May 29, 2014. (Id.)

COL 181.    The federal agents seized approximately $17,350.00[11] from the safe deposit box and $188,269.34[12] from the bank account. (H.T. 9/18/2018 (ECF No. 756) at 149.)

COL 182.    The day after the search of the Brintell Street home, Wilson had approximately $61,604.00 in his bank accounts. (H.T. 9/17/2018 (ECF No. 755) at 110-13, 122.) Wilson used that money "[t]o keep…[his] business going…[t]o purchase tickets." (Id. at 120.)

COL 183.    The federal agents found all the cash Wilson hid in the Brintell Street home except for $40,000.00. (H.T. 9/17/2018 (ECF No. 755) at 113.)

COL 184.    As of May 29, 2014, there was $188,269.34 in Stegman's bank account at Citizen Bank. (ECF No. 584 at 6; H.T. 9/17/2018 (ECF No. 755) at 48.) According to Wilson, the money in that account was from his ticket sales and belonged to him. (Id.) He explained:

> It was ticket sales form the checks that I received from Lower Level Tickets, which, like I said, they sent me five, six hundred thousand. I mean, I sold over a mill[ion] dollars['] worth of tickets in that eight-year span, and that's not even all the way through because some of that, some of them years was short. I mean, some of them years he couldn't find stuff. For like there was three years maybe he sold ten thousand dollars['] worth of tickets, but then the following year he sold two hundred thousand dollars. He just couldn't find everything as far as my information as far as tickets.

(H.T. 9/17/2018 (ECF No. 755) at 49.) Wilson did not have any records of his own with respect

---

[11]    Wilson did not testify to an "exact number" with respect to the amount of money in the safe deposit box that was seized by federal agents; rather, he testified that the federal agents seized "maybe" $18,000.00 from the safe deposit box. (H.T. 9/17/2018 (ECF No. 755) at 32-33.) Francis testified that the federal agents seized "approximately" $17,500.00 from the safe deposit box. (H.T. 9/18/2018 (ECF No. 756) at 149.) The final order of forfeiture entered in this case, however, ordered the forfeiture of $17,350.00 seized from the safe deposit box. (ECF No. 540 at 1.) Based upon the foregoing, there was $17,350.00 in the safe deposit box on May 29, 2014, that was seized by the federal agents.

[12]    Wilson and Francis testified that approximately $188,000.00 was seized from Stegman's bank account. The final order of forfeiture entered in this case shows that $188,269.34 was seized from Stegman's bank account. (ECF No. 584 at 6.)

to his ticket sales with Lower Level Tickets. (Id.)

COL 185.    When Wilson went to Citizen bank later in the day on May 29, 2014, the $188,269.34 was not in Stegman's account and the $17,350.00 was gone from Stegman's safe deposit account. (H.T. 9/17/2018 (ECF No. 755) at 48-49.)

COL 186.    Wilson testified that the money in Stegman's safe deposit account was proceeds from his ticket sales. (H.T. 9/17/2018 (ECF No. 755) at 50.)

### Defendant's Criminal Proceedings

COL 187.    The government extended a plea offer to defendant dated November 12, 2015. (H.T. 9/ 17/2018 (ECF No. 755) at 143.) Defendant rejected that plea offer. (Id. at 162.)

COL 188.    Defendant explained he did not accept the plea offer because "the forfeiture that was in the plea agreement wasn't…[his]." (H.T. 9/17/2018 (ECF No. 755) at 183.)

COL 189.    On January 27, 2016, the government filed a superseding against defendant and two of his codefendants. (ECF No. 494.) The superseding indictment charged defendant with the two counts set forth in the indictment and added a charge for conspiring to carry and possess a firearm in relation to and in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(o). (Id.) The superseding indictment contained the same forfeiture allegations set forth in the original indictment with respect to the acquired proceeds as a result of the conspiracy. (Id. at 6.)

COL 190.    A mandatory term of imprisonment of ten years applied to count one of the superseding indictment. (H.T. 9/17/2018 (ECF No. 755) at 166.) The court at the time of sentencing had a choice whether to concurrently or consecutively run the term of imprisonment imposed at count three of the superseding indictment to the term of imprisonment imposed at

count one. (Id.) Defendant's counsel explained to him that the court could impose the term of imprisonment with respect to count three consecutively to the mandatory ten-year term of imprisonment imposed count one. (Id. at 165.)

COL 191.    After the superseding indictment, defendant's counsel wrote the government a letter asking it to "consider permitting…[defendant] to forfeit just whatever interest he had in the items they wanted forfeited, rather than make an acknowledgement that the proceeds were that of the illegal activity." (H.T. 9/17/2018 (ECF No. 755) at 148.) The counsel explained to the government that the money was not defendant's money. (Id. at 150.) The government rejected the counsel's request. (Id. at 148.)

COL 192.    The government presented defendant a plea offer dated April 28, 2016. (H.T. 9/17/2018 (ECF No. 755) at 148-49.) The plea offer, which set forth an agreed upon term of imprisonment of ten years pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), provided, among other things:

> 2. He will voluntarily forfeit to the United States all property subject to forfeiture under 21 U.S.C. §§ 853(a)(1), 853(a)(2), 853(p), 18 U.S.C. §2461(c), and 18 U.S.C. §924(d)(1), including but not limited to the following: $521,837.00 in U.S. Currency; Rossi Revolver .32 caliber handgun seized on May 29, 2014; 56 rounds of .32 caliber ammunition; 9 rounds of .40 caliber ammunition; $17,350.00 in U.S. Currency; $188,269.34 in U.S. Currency from Bank Account #6252971597; Silver Colt King Cobra, .357 caliber firearm, bearing serial number K0832C, seized on April 4, 2014; and a Smith & Wesson .40 Cal. Handgun seized on April 16, 2014.

> 3. He acknowledges that the above-described property constitutes the proceeds of the aforementioned criminal offenses and/or was used to facilitate the commission of those crimes, and is presently the subject of a criminal forfeiture action at the above-captioned criminal case number. He herewith voluntarily consents to the Court entering an order of forfeiture of said property to the United States.

(Gov't Ex. 26 ¶¶ 2-3.)

COL 193.    Defendant asked his counsel about the forfeiture provisions in the plea offer. (H.T. 9/17/2018 (ECF No. 755) at 187.)

COL 194.    Defendant's counsel told defendant the forfeiture provisions "wouldn't affect the forfeiture because…[Wilson] already claimed it." (H.T. 9/17/2018 (ECF No. 755) at 187.)

COL 195.    Wilson testified that defendant's lawyer asked Wilson to relinquish his rights to the money described in paragraph three of defendant's plea agreement to give defendant "a better deal." (H.T. 9/17/2018 (ECF No. 755) at 99.) Wilson refused to relinquish his right to that money. (Id. at 100.)

COL 196.    On May 2, 2016, defendant signed the second plea agreement with the government dated April 28, 2016. (H.T. 9/17/2018 (ECF No. 755) at 149.)

COL 197.    On the same day, the court held a change of plea hearing for defendant during which defendant pleaded guilty to counts one, two, and three of the superseding indictment. (ECF No. 537.)

COL 198.    Defendant during the change of plea hearing agreed with following summary of his criminal conduct in this case:

> Mr. Wilson was charged as described in the superseding indictment at Criminal No. 14-132. Mr. Wilson was a core member of Bricks R Us. The FBI wiretapped multiple phones utilized by Mr. Wilson. He was also intercepted over Terrell Evans' and Dominique Harvey's phones.

> Wilson was supplied a large portion of this heroin from Jarran Bell, but had other suppliers as well, such as Quamar Linton, and in fact Mr. Linton distributed approximately 30 bricks of heroin to Mr. Wilson on March 31st, 2014, and approximately 70 bricks of heroin to Mr. Wilson on April 16th of 2014, and there were wiretap intercepts related to that.

> Mr. Bell was not indicted as part of the instant investigation, but was indicted in a pending multi-Defendant matter before Judge Cohill at Criminal No.

15-97.

Within a ten-day period during the investigation of Mr. Wilson, Mr. Bell supplied approximately 700 bricks of heroin to Mr. Wilson. Mr. Wilson had a robust distribution network and supplied heroin to numerous other people, including but not limited to Miranda Rosenberger, Michael Cox, Saleh Tinsley-Ewell, Travis Anthony, Benton Nixon, Charles Blystone, Shawn Ellis, Jr., William Smith, Melvin Moore, and Breya Bowles. Mr. Wilson also distributed heroin to juveniles and used them to facilitate his drug trafficking.

There are numerous calls during the wiretap confirming Mr. Wilson's efforts to acquire firearms from his co-conspirators. For example, on March 4th, 2014, Travis Anthony was stopped by Pittsburgh police while in route to meet Mr. Wilson to trade a firearm for two bundles of heroin. The police seized a .357 revolver from Mr. Anthony. Mr. Anthony had syringes and a spoon on his person and in his jacket. These negotiations to trade this firearm for heroin were intercepted over Mr. Wilson's phone.

Mr. Wilson refers to himself as Kittanning Mike or Mike to a certain sect of his customers and has even been known to wear a shirt which read, 100 Bricks At A Time, on the front of the shirt and the nickname Kittanning Mike on the sleeve.

Wilson had a large base of customers and/or distributors such as Miranda Rosenberger and Charles Blystone that would travel from the Armstrong County area where Kittanning is located. On April 15th of 2014, William Smith indicated that he was coming to Wilson to trade a gun and cash for four bricks of heroin. Mr. Smith was then intercepted the next day as he was about to meet Wilson with the gun and money. At the time Smith was apprehended by Monroeville police with a .40 caliber handgun and $1,000.

A number of search warrants were conducted at a number of locations associated with Mr. Wilson on the date of his arrest in this matter. Large sums of cash and a firearm and ammunition were seized at locations that he was connected to.

Based on this evidence, including but not limited to Title 3 intercepts and heroin seized as part of the overall investigation, the United States would establish at trial and at sentencing that during various points in time from in and around October, 2013, and continuing thereafter to in and around May, 2014, Mr. Wilson conspired with others to possess with intent to distribute and distribute heroin and that the amount attributable to him is more than one kilogram but less than three kilograms of heroin, which is a Schedule 1 controlled substance.

(H.T. 5/2/2016 (ECF No. 626) at 21-24.)

COL 199.    There are fifty stamp bags in a brick of heroin. (H.T. 9/17/2018 (ECF No. 755) at 196.) Defendant at the change of plea hearing admitted that he bought seven hundred bricks of heroin from Jarran Bell ("Bell") over a ten-day period and seventy bricks of heroin from Quamar Linton ("Linton") (one of defendant's codefendants) during the same ten-day period. (Id.) In other words, defendant admitted to 38,500 stamp bags in a ten-day period. (Id.)

COL 200.    The government during the change of plea hearing set forth, among others, paragraphs 2 and 3 of the plea agreement. (H.T. 5/2/2016 at 5-6 (under seal).)

COL 201.    The following exchange took place between the court, the government, defendant, and his counsel:

THE COURT: Yes, thank you. Mr. McQuillan, do you agree the terms of the plea agreement were correctly stated by Ms. Johnston?

MR. MCQUILLAN: I do, Your Honor.

THE COURT: Mr. Wilson, did you hear the terms of the plea agreement that were just reviewed for you by Ms. Johnston?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Did she correctly state the terms of the plea agreement as you understand them?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand those terms?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Now, I want to review with you the paragraph before your signature. It says that you received the letter from your attorney, Mr. McQuillan. Is that true?

THE DEFENDANT: Yes, Your Honor.

THE COURT: It says that you read it and discussed it with him. Is that true?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And it says that you accept and acknowledge that it fully sets forth your agreement with the office of the United States Attorney for the Western District of Pennsylvania. Is that true?

THE DEFENDANT: Yes, Your Honor.

THE COURT: You are also affirming that there were no additional promises or representations made to you by any agents or officials of the United States in connection with this matter. Is that true?

THE DEFENDANT: Yes, Your Honor.

…

THE COURT: Now, has anyone made any promise or given you any assurance that's not in the plea agreement to persuade you to accept the plea agreement and to plead guilty?

THE DEFENDANT: No, Your Honor.

THE COURT: Has anyone attempted in any way to force you to plead guilty or otherwise threatened you or anyone else in order to persuade you to plead guilty?

THE DEFENDANT: No, Your Honor.

…

THE COURT: Have you been instructed by your attorney, the attorney for the Government, or anyone else to respond untruthfully to any question I have asked you or may ask you?

THE DEFENDANT: No, Your Honor.

THE COURT: Ms. Johnston, other than the plea agreement that was presented today, did the Government tender to counsel for the Defendant any other formal plea agreement offer?

MS. JOHNSTON: Your Honor, this is the only formal offer that was tendered from the United States Attorney's office.

THE COURT: Mr. McQuillan, did you receive any formal plea agreement offer from the Government that you did not communicate to Mr. Wilson?

MR. MCQUILLAN: No, Your Honor. May I just have a moment with Ms. Johnston, please.

37

MS. JOHNSTON: If I may just clarify, Your Honor. There were numerous informal plea discussions and even some draft plea letters that were exchanged between myself and Mr. McQuillan and also Mr. Wilson's previous counsel, Mr. Thomassey. However, in terms of an actual signed agreement, that can only come from the United States Attorney or the First Assistant in this case. This is the only formal offer that was communicated.

MR. MCQUILLAN: That clarifies it, Your Honor, thank you.

(H.T. 5/2/2016 at 14-18 (under seal).)

COL 202.    Defendant's probation officer prepared a presentence investigation report

("PIR"). (ECF No. 566.) The PIR provided:

The defendant will voluntarily forfeit to the Government all property subject to forfeiture under 21 U.S.C. §§ 853(a)(1), 853(a)(2), 853(p), 18 U.S.C. § 2461(c), and 18 U.S.C. § 924(d)(1), including, but not limited to, the following: $521,837.00 in U.S. currency; a Rossi Revolver .32 caliber handgun seized on May 29, 2014; 56 rounds of .32 caliber ammunition; $17,350.00 in U.S. currency; $188,269.34 in U.S. currency from Bank Account #6252971597; a silver Colt King Cobra, .357 caliber firearm, bearing serial number K0832C, seized on April 4, 2014; and a Smith & Wesson .40 Cal. Handgun seized on April 16, 2014.

(Id. ¶ 9.)

COL 203.    Defendant's counsel did not object to that provision of the PIR or

otherwise argue during the sentencing proceedings that forfeiture of the money was not

applicable in his case. (H.T. 9/17/2018 (ECF No. 755) at 155-56, 159-60); (H.T. 8/19/2016 (ECF

No. 732).)

COL 204.    Defendant's counsel did not appeal his conviction or sentence. (H.T.

9/17/2018 (ECF No. 755) at 160.) Defendant explained:

The forfeiture, that was the only problem in this case. I pled guilty to three counts, and the forfeiture was already claimed. So, there was no, I didn't feel it was right to file an appeal. It was already claimed.

(H.T. 9/18/2018 (ECF No. 756) at 98.)

COL 205.    Defendant testified that his attorney told him that Wilson's forfeiture proceedings "would not be affected by…[him] taking…[the] plea." (H.T. 9/18/2018 (ECF NO. 756) at 93.) Defendant advised Wilson's attorney and his attorney that he "would not take…[the] plea if it affected the forfeiture." (H.T. 9/18/2018 (ECF NO. 756) at 95.)

COL 206.    Following defendant's change of plea hearing, he mailed a letter to the court. (H.T. 9/18/2018 (ECF No. 756) at 94; Gov't Ex. 27.) Defendant in the letter did not contest the forfeiture provisions of his plea agreement. (Id.)

COL 207.    Forty-eight hours after the federal agents conducted the search of the Brintell Street home, Wilson hired the attorney representing him in these forfeiture proceedings. (H.T. 9/17/2018 (ECF No. 755) at 50.)

## IV.    Conclusions of Law

### Federal Rule of Civil Procedure 60(b) and Wilson's Failure to File a Timely Motion

COL 1.    In a criminal case,[13] 21 U.S.C. § 853(n) and Federal Rule of Criminal

---

[13]    With respect to civil forfeiture proceedings asserted under 21 U.S.C. § 881, one court has explained:

Civil forfeiture under 21 U.S.C. § 881 is an in rem action which proceeds on the legal fiction that the property itself is guilty of wrongdoing. Although a criminal conviction is not a prerequisite to civil forfeiture, the civil forfeiture usually involves property which has been used in, or is related to, a criminal enterprise. United States v. $152,160.00 in United States Currency, 680 F.Supp. 354, 356 (D.Colo.1988) (citing Calero–Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974)).

In a civil forfeiture proceeding, the government bears the burden of going forward and must establish probable cause that the property was involved in criminal activity. The burden then shifts to the claimant to prove by a preponderance of the evidence that the property is not subject to forfeiture. United States v. $39,000 in Canadian Currency, 801 F.2d 1210, 1216–17 (10th Cir.1986). See Boas v. Smith, 786 F.2d 605, 609 (4th Cir.1986) (the government must establish probable cause for belief that a substantial connection exists between the

Procedure 32.2 govern the court's resolution of a third-party's assertion of right to forfeited property.

COL 2.    The Third Circuit Court of Appeals has explained that there exists under Rule 32.2. a "bifurcated forfeiture procedure for all interested parties." United States v. Nicoll, 711 F. App'x 108, 110 (3d Cir. 2017).

COL 3.    First, the court makes a preliminary forfeiture determination based upon input from the government and the defendant. Id. During the preliminary stage of forfeiture, the government bears the burden by a preponderance of the evidence to prove "the requisite nexus between the property and the offense." FED. R. CRIM. P. 32.2(b)(1)(A); United States v. Jones, 502 F.3d 388, 391 (6th Cir. 2007). The preliminary forfeiture determination "affects only the rights of the defendant." Nicoll, 711 F. App'x at 110.

COL 4.    Second, third parties may file "ancillary proceedings and establish their superseding or *bona fide*-purchaser interests in the forfeited property." Id. (quoting FED. R. CRIM. P. 32.2(c)). Third parties, however, are prohibited from "re-litigat[ing]…matters pertinent to the

---

property to be forfeited and the criminal activity; the burden of proof then shifts to the claimant to establish by a preponderance of the evidence that the property was not used in violation of the law or was not intended to be used unlawfully).

Probable cause for forfeiture means reasonable grounds for belief of guilt, supported by less than prima facie proof but more than mere suspicion that the property is being used for criminal activities. United States v. $15,460.00 in United States Currency, 741 F.Supp. 819, 820–21 (D.Or.1990). Probable cause in a forfeiture proceeding may be established by circumstantial evidence, United States v. $38,600.00 in United States Currency, 784 F.2d 694, 697 (5th Cir.1986), or inadmissible hearsay. $15,460.00 in United States Currency, 741 F.Supp. at 821; United States v. A Parcel of Land, Buildings, Appurtenances, and Improvements, Known as 92 Buena Vista Ave., 738 F.Supp. 854, 857 (D.N.J.1990), aff'd in part, remanded in part on other grounds, 937 F.2d 98 (3d Cir.1991).

United States v. $83,900.00 in U.S. Currency, 774 F. Supp. 1305, 1319–20 (D. Kan. 1991).

prior stage of the proceedings from which…[third parties] are statutorily excluded." Id. "Only if the third party has established it has a vested right in the property superior to that of the defendant, or it is a bona fide purchaser of the property, will the court amend the preliminary forfeiture order." Id. (citing United States v. Lavin, 942 F.2d 177, 185 (3d Cir. 1991)).

COL 5.     Once the court enters a preliminary order of forfeiture, the government must publish notice of the preliminary order. 21 U.S.C. § 853(n)(1); FED. R. CRIM. P. 32.2(b)(6).

COL 6.     Section 853(n)(1) provides:

(1) Following the entry of an order of forfeiture under this section, the United States shall publish notice of the order and of its intent to dispose of the property in such manner as the Attorney General may direct. The Government may also, to the extent practicable, provide direct written notice to any person known to have alleged an interest in the property that is the subject of the order of forfeiture as a substitute for published notice as to those persons so notified.

21 U.S.C. § 853(n)(1).

COL 7.     Rule 32.2(b)(6)(A) provides:

If the court orders the forfeiture of specific property, the government must publish notice of the order and send notice to any person who reasonably appears to be a potential claimant with standing to contest the forfeiture in the ancillary proceeding.

FED. R. CRIM. P. 32.2(b)(6)(A).

COL 8.     Section 853(n) sets forth procedures that a third party must follow to claim an ownership in property forfeited in a criminal proceeding. Section 853(n)(2) provides:

(2) Any person, other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States pursuant to this section may, within thirty days of the final publication of notice or his receipt of notice under paragraph (1), whichever is earlier, petition the court for a hearing to adjudicate the validity of his alleged interest in the property. The hearing shall be held before the court alone, without a jury.

(3) The petition shall be signed by the petitioner under penalty of perjury and shall set forth the nature and extent of the petitioner's right, title, or interest in the

property, the time and circumstances of the petitioner's acquisition of the right, title, or interest in the property, any additional facts supporting the petitioner's claim, and the relief sought.

21 U.S.C. § 853(n)(2).

COL 9.    The Third Circuit Court of Appeals has held that the procedural requirements of having (1) a timely petition that is (2) signed under penalty of perjury are perquisites to a third party having standing to assert his or her ownership in property in a civil case. United States v. $487,825.000 in U.S. Currency, 484 F.3d 662, 664 (3d Cir. 2007), *as amended* (May 14, 2007).

COL 10.    Other courts in have applied the same rule to third parties asserting a legal claim to property subject to forfeiture in criminal cases. United States v. Loria, Crim. No. 3:08cr233-2, 2009 WL 3103771, at *2 (W.D.N.C. Sept. 21, 2009) (finding a petition was invalid because it was not signed under penalty of perjury); United States v. Edwards, Crim. Action No. 06-50127-01, 2007 WL 2088608, at *3(W.D. La. July 20, 2007) (granting the government's motion to dismiss a third-party petition because, among other reasons, it was not signed under penalty or perjury).

COL 11.    Rule 32.2(c)(1) provides that if "a third party files a petition asserting an interest in the property to be forfeited, the court must conduct an ancillary proceeding[.]" FED. R. CRIM. P. 32.2(c)(1).

COL 12.    During the ancillary proceeding, the burden of proof shifts to the third party to prove by a preponderance of the evidence its right to the property. 21 U.S.C. § 853(n)(6).

COL 13.    If, after the thirty-day time period set forth in § 853(n)(2) expires, the

court does not receive a petition from a third party, the government "shall have clear title to property that is the subject of the order of forfeiture and may warrant good title to any subsequent purchaser or transferee." 21 U.S.C. § 853(n)(7); FED. R. CRIM. P. 32.2(c)(2) ("If no third party files a timely petition, the preliminary order becomes the final order of forfeiture if the court finds that the defendant (or any combination of defendants convicted in the case) had an interest in the property that is forfeitable under the applicable statute.").

COL 14.       Here, on May 13, 2016, this court issued a preliminary order of forfeiture. (ECF No. 540.) The government thereafter published the notice of forfeiture on its official website from May 16, 2016, through June 15, 2016. (ECF No. 565.) Wilson, therefore, had until **July 15, 2016**, to file his petition for an ancillary proceeding with respect to the $727,456.34. 21 U.S.C. § 853(n)(2). On August 19, 2016, the court, having not heard from Wilson or any other third-party in this criminal case, entered a final order of forfeiture with respect to, among other things, the $727,456.34. (ECF No. 584); 21 U.S.C. § 853(n)(7); FED. R. CRIM. P. 32.2(c)(2).

COL 15.       Wilson did not file his motion for adjudication of his interest in the $727,456.34 until March 15, 2017, i.e., 243 days after the expiration of the thirty-day deadline provided for in § 853(n)(2).

COL 16.       The Third Circuit Court of Appeals, however, has instructed that "[a]n untimely petition filed after a final order of forfeiture has been entered should be treated as a motion seeking relief from the judgment under Rule 60(b) of the Federal Rules of Civil Procedure…." United States v. Neidig, 253 F. App'x 239 (3d Cir. 2007).

COL 17.       Rule 60(b) provides that a court may relieve a party from a final judgment if the party can show:

(1) mistake, inadvertence, surprise, or excusable neglect;

43

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) any other reason that justifies relief.

FED. R. CIV. P. 60(b).

COL 18.    For example, a third-party seeking to claim ownership in property forfeited by a criminal defendant may show "excusable neglect" in failing to file a timely petition by showing "that he did not receive notice of the forfeiture because his prison does not subscribe to the newspaper in which notice was published and that he diligently tried to protect his interests by attempting to file a lien against the property well before the District Court entered its final order of forfeiture." Neidig, 253 F. App'x at 240.

COL 19.    The court will construe Wilson's untimely motion as a "motion seeking relief from the judgment under Rule 60(b)." Neidig, 253 F. App'x at 240. The court must determine whether there exist grounds for relieving Wilson from the final judgment of forfeiture when he missed the deadline for filing his petition by eight months.

COL 20.    As detailed above, on November 6, 2014, more than five years before the final order of forfeiture was filed, the government filed a complaint against the $727,456.34 in the civil case because Wilson contested the administrative forfeiture proceedings against the $727,456.34. (Civ. Action No. 14-1525, ECF No. 1 ¶ 8.) On January 23, 2015, the court in the

civil case approved a stipulation entered into between the government and Wilson to stay the case "until the conclusion of the related criminal case at 14-CR-132 (WPDA) against Paris Wilson…." (Civ. Action No. 14-1525, ECF No. 5 ¶ 2.) The stay included a stay of Wilson's "duty…to file a claim and answer in the event that he wish[ed] to contest…[the] action." (Id.) The court, however, did not lift the stay at the conclusion of defendant's criminal case or at the request of Wilson; rather, on March 21, 2017, the court determined that the forfeiture issues would be handled in the criminal case in an ancillary proceeding, pursuant to 21 U.S.C. § 853.

COL 21.      In light of Wilson asserting his right to the money more than five years before the entry of the final order of forfeiture, the stay of the civil case until the resolution of defendant's criminal case, this court's directive that Wilson's motion would be addressed in defendant's criminal case, and the government's failure to object to the timeliness of Wilson's motion, Wilson can satisfy his burden under Rule 60(b) to show good cause for failing to timely assert his interest in the $727,456.34 in this criminal case.

COL 22.      Under those circumstances, the court will consider Wilson's motion for adjudication of his interest in the $727,456.34, and, if he satisfied his burden to prove by a preponderance of the evidence his right to any portion of the money, the court's final order of forfeiture dated August 19, 2016, will be vacated and an amended order of forfeiture will be entered.

### Conclusions with respect to whether the Government Satisfied its Burden

COL 23.      As discussed previously, the government satisfied its burden to show by a preponderance of the evidence the requisite nexus between the $727,456.34 and defendant's offenses of conviction because defendant in his plea agreement agreed: (1) to voluntarily forfeit

the $727,456.34; and (2) that the $727,456.34 "constitute[d] the proceeds of…[his criminal activity] and/or was used to facility the commission of those crimes." (Gov't Ex. 26 ¶¶ 2-3.)

COL 24.     On that basis, the court granted the government's motion for forfeiture of property, (ECF No. 539), and issued a preliminary order of forfeiture, (ECF No. 540).

COL 25.     The burden, therefore, shifted to Wilson in this ancillary proceeding to prove his vested right in the $727,456.34 is superior to defendant's right to that money. Whether Wilson satisfied his burden is addressed below.

### Conclusions with respect to whether Wilson Satisfied his Burden[14]

---

[14]     The government argues extensively that the court should consider the forfeiture provisions of the plea agreement with respect to the $727,456.34 to which defendant agreed and his silence with respect to the forfeiture provision at the change of plea hearing, at sentencing, and in his submissions to the court as evidence that all the money seized by the federal government was proceeds of defendant's criminal activity, and, thus, Wilson cannot satisfy his burden in this ancillary proceeding. (ECF No. 763 at 8-12.) As the court in United States v. Nicoll, Crim. Action No. 13-385, 2015 WL 13628130 (D.N.J. April. 29, 2015), explained, however:

> A defendant who seeks a favorable plea deal from the Government may be motivated to endorse forfeiture even if no nexus [between the forfeited money and his criminal activity] exists. That concern is heightened if the defendant has no personal interest in the property at issue.

Id. at *4 (citing FED. R. CRIM. P. 32.2(b) advisory committee's note to 2000 adoption ("[A] defendant who has no interest in property has no incentive, at trial, to dispute the government's forfeiture allegations."); Libretti v. United States, 516 U.S. 29, 43 (1995) ("We do not mean to suggest that a district court must simply accept a defendant's agreement to forfeit property, particularly when that agreement is not accompanied by a stipulation of facts supporting forfeiture[.]")).

Evidence was presented in this case that defendant believed that if he did not accept the plea agreement, including the forfeiture provisions, he would face additional jail time. (H.T. 9/17/2018 (ECF No. 755) at 147, 185.) Defendant testified that he told his attorney he did not want to accept the plea agreement because it contained the forfeiture provision, but he believed he did not have any other choice "because of the new charges." (Id. at 186.) Defendant's attorney contacted the government to request the forfeiture provision be amended to permit defendant "to forfeit just whatever interest he had in the items they wanted forfeited, rather than make an acknowledgment that the proceeds were that of the illegal activity." (Id. at 148.) The government rejected that request. (Id.) Defendant accepted the plea agreement because his attorney told him "it wouldn't affect the forfeiture because…[his] dad already claimed it." (Id. at 186-87.)

COL 26.      There are three categories of locations in which federal agents found and seized money that Wilson argues belongs to him: (1) the Citizens Bank safe deposit box and bank account in Stegman's name; (2) locations in the Brintell Street home in which the record provides the exact amount of money found in those locations, i.e., the dishwasher and the bobble head boxes in Wilson's bedroom; and (3) locations in the Brintell Street home in which the record does not provide the exact amount of money found in those locations.

COL 27.      The court will consider the evidence presented with respect to each of those categories to determine whether Wilson satisfied his burden to show that it is more likely than not that he has a "vested right in the…[money] superior to that of…defendant['s]." Nicoll, 711 F.App'x at 11.

### Money earned by Wilson via his Ticket Reselling Business

COL 28.      The evidence presented shows that Wilson's ticket reselling business[15] involved a significant amount of cash and that he was generating a significant amount of income from that business because he made a significant amount of money prior to defendant trafficking heroin and after defendant was incarcerated in this case.

COL 29.      For example, the record shows that defendant began selling heroin in or about 2010. Prior to that time, Wilson purchased in cash the home on Franklin Avenue for $40,000.00 and the Brintell Street home for $123,000.00.

COL 30.      Defendant has been in jail since 2014. The day after the federal agents

---

Based upon the foregoing, while defendant's entry into the plea agreement may be evidence upon which the government relied to satisfy its initial burden to show the requisite nexus between the money and defendant's criminal activity, it is not determinative with respect to whether Wilson has an interest in the money that is *superior* to defendant's interest. See Nicoll, 2015 WL 1362130, at *4.

[15]      Wilson was not indicted in this case with respect to defendant's heroin trafficking activities.

seized the money from Citizens Bank and the Brintell Street home, Wilson had $61,604.00 in his bank accounts. As of the date of the forfeiture hearing in this case, Wilson had approximately $410,000.00 in his bank accounts, which means in a four-year period he accrued at least $348,396.00.

COL 31.    During the same period, i.e., after defendant's arrest, Wilson paid off the loan on the 2010 Mercedes he purchased for Waytes, paid all the expenses for the Brintell Street home, paid for ninety-percent of the food for the occupants of the home, paid $320.00 per month for cellular telephones, and $514.00 per month for health insurance.

COL 32.    After the federal agents seized the $727,456.34 in May 2014, Wilson had approximately $163,208.00 from which he was able to continue his ticket reselling business.

COL 33.    Wilson, however, did not prove by a preponderance of the evidence the total amount of money he earned from 2010 through 2014. Wilson introduced evidence of tax returns prepared by Daniels, but there was no evidence presented to support the numbers he gave to Daniels for the tax returns and he never filed those tax returns.

COL 34.    In light of the evidence of Wilson's purchases before defendant started selling heroin and after he was arrested in this case, however, he proved that it is more likely than not that he earned significant amounts of money from his ticket reselling business that was separate from the money defendant made trafficking heroin. In other words, Wilson's ticket reselling business was a source of at least part of the $727,456.34 seized by federal agents in this case.

COL 35.    The three categories of locations in which money was found will be separately considered to determine whether Wilson satisfied his burden to show that it is more

48

likely than not that his interest in the money found in those locations is superior to any interest forfeited by defendant.

## Stegman's Citizens Bank Account and Safe Deposit Box

COL 36.    Federal agents seized approximately $17,350.00 from Stegman's safe deposit box and $188,269.34 from Stegman's bank account.

COL 37.    With respect to the bank account, Wilson testified that he deposited more than $500,000.00 in checks written to Stegman from Lower Level Tickets into her Citizen Bank account and would withdraw cash from the account with her. The $188,269.34 in the bank account on May 29, 2014, was from his ticket sales.

COL 38.    Although Wilson did not produce any records with respect to his ticket sales with Lower Level Tickets, defendant did not know about Stegman's bank account until the day he turned himself in to authorities and there is no evidence of record to establish a sufficient nexus between defendant's drug activity to Stegman's bank account at Citizens Bank other than the bank records found inside the Brintell Street home where Stegman and Wilson lived.

COL 39.    Based upon the foregoing, Wilson proved that it is more likely than not that he has an interest to the $188,269.34 the federal agents seized from Stegman's bank account at Citizens Bank that is superior to the rights to that money forfeited by defendant in this criminal case. The final order of forfeiture dated August 19, 2016, will be vacated and an amended order of forfeiture will be entered to reflect that amount will not be forfeited and will be ordered to be turned over to Wilson.

COL 40.    With respect to the money seized from Stegman's safe deposit box, the evidence of record showed that the money was proceeds from Wilson's ticket sales; indeed,

49

Wilson had signatory authority on the safe deposit box. The evidence of record showed that while it is more likely than not that Wilson did not personally make the deposits into the safe deposit box, he went to the bank with Stegman to access the safe deposit box.

COL 41.　　Other than the safe deposit box key found inside the Brintell Street home, the record is bereft of evidence connecting defendant to Stegman's safe deposit box; rather, the evidence of record shows that it is more likely than not that Wilson had a right to the contents of the safe deposit box that are superior to the rights that defendant forfeited in this case.

COL 42.　　Under those circumstances, the final order of forfeiture dated August 19, 2016, will be vacated with respect to the $17,350.00 seized from Stegman's safe deposit box and an amended order of forfeiture will be entered to reflect that amount will not be forfeited and will be ordered to be turned over to Wilson.

**Money Found in the Dishwasher and in Bobblehead Doll Boxes in the Brintell Street Home**

COL 43.　　The evidence of record shows that money was found in several places inside the Brintell Street home, and Wilson testified that all the money was proceeds from his ticket reselling business.

COL 44.　　The evidence of record also showed that defendant was dealing in significantly large amounts of heroin, e.g., in a ten-day period, defendant purchased 38,500 stamp bags of heroin, which is equivalent to 770 bricks of heroin. Defendant purchased those bricks of heroin for approximately $175.00 per brick and sold each brick to end-dealers for approximately $200.00 per brick. Defendant, therefore, required approximately $134,750.00 to purchase the heroin during the ten-day period and made a profit of approximately $19,250.00 when he resold the heroin to end-dealers.

COL 45.      Defendant during the ten-day period in which he was being surveilled by law enforcement entered and exited the Brintell Street home with a large shopping bag of cash. Defendant's testimony that he did not store money in the Brintell Street home is, therefore, belied by the credible evidence of record that shows he entered and exited the home with a shopping bag of cash. The court, therefore, cannot find that Wilson proved that it is more likely than not that *all the money* found in the Brintell Street home was proceeds from his ticket reselling business.

COL 46.      Wilson has the burden of proof to show that his right to the money found in the home is superior to defendant's right to that money.

COL 47.      The evidence of record provides the specific amount of money found in only two of the locations in the Brintell Street home: the dishwasher and inside five bobblehead doll boxes found inside Wilson's bedroom. The federal agents seized $83,610.00 from the dishwasher and $100,000.00 amongst five bobblehead doll boxes in Wilson's bedroom.

COL 48.      With respect to the dishwasher, Wilson showed the federal agents the various locations in which money was hidden in the Brintell Street home, but he did not show the agents the money hidden in the dishwasher, which was in the kitchen of the home. Wilson offered ambiguous testimony about whether he hid the $83,610.00 in the dishwasher. He testified that he kept cash in the dishwasher that was not working. He also testified, however, that he did not keep "stuff" in the dishwasher; rather, the money probably been sitting there since the dishwasher was there." (H.T .9/17/2018 (ECF No. 755) at 97.)

COL 49.      Based upon the foregoing, Wilson did not satisfy his burden to show that it is more likely than not that the money in the dishwasher was proceeds from his ticket reselling

business as oppose to money used in defendant's illegal drug trafficking. In other words, Wilson did not prove by a preponderance of the evidence that he has a right to the money found in the dishwasher that is superior to the right of defendant's that was forfeited in this case.

COL 50.     With respect to the money found in the bobblehead doll boxes, the evidence of record showed: (a) Wilson showed the federal agents the money hidden inside the bobblehead doll boxes; (b) the bobblehead doll boxes were located in Wilson's bedroom; (c) the bobblehead doll boxes were for bobblehead dolls of a Pittsburgh Pirates baseball player; and (d) Wilson sold a significant number of Pittsburgh Pirates tickets, many of which were sold "on the streets" at a game.  (H.T. 9/17/2018 (ECF No. 755) at 8-9, 17-18.)

COL 51.     Based upon these facts, Wilson proved that it is more likely than not that the money found inside his bedroom in the bobblehead doll boxes were proceeds of his ticket reselling business. The final order of forfeiture dated August 19, 2016, will be vacated with respect to the $100,000.00 found in Wilson's bedroom in the bobblehead doll boxes and an amended order will be entered to reflect that amount will not be forfeited and will be ordered to be turned over to Wilson.

### Money found in other locations of the Brintell Street Home

COL 52.     As discussed above, money was found in the Brintell Street home in Wilson's bedroom, the basement, and in the dishwasher in the kitchen. Except for the money found in the bobblehead doll boxes and in the dishwasher, the court is without evidence of the amount of money found in each of the other locations. There was $338,227.00[16] found amongst the other locations in the Brintell Street home.

---

[16]     This figure represents the $521,837.00 found in the Brintell Street home minus (1) the $100,000.00 found amongst the five bobble head doll boxes, and (2) the $83,610.00 found in the dishwasher.

COL 53.  Wilson did not prove that it is more likely than not that the entire $338,227.00 was proceeds of his ticket resale business.

COL 54.  First, the evidence shows that defendant was bringing money used in his heroin trafficking in and out of the Brintell Street home.

COL 55.  Second, cash was found sitting atop of an envelope with defendant's name and the Brintell Street address in the return address.

COL 56.  Under those circumstances, the court cannot find that Wilson proved by a preponderance of the evidence that he has a right to the money found with that envelope which is is superior to defendant's right to that money.

COL 57.  The court, however, is without sufficient information to determine how much of the $338,227.00 was sitting atop of the envelope bearing defendant's name. The court, therefore, cannot fashion an amended final order of forfeiture setting forth the dollar amounts that should be forfeited by defendant to the government or given back to Wilson.

COL 58.  Under those circumstances, Wilson did not satisfy his burden in this case to show that he has an interest in the $338,227.00 that is superior to the interest of defendant. Wilson's motion will, therefore, be denied with respect to $338,227.00 found in the Brintell Street home.

## V.    Conclusion

Wilson satisfied his burden to prove by a preponderance of the evidence that his right to the:

- $188,269.34 seized from Stegman's bank account;

- $17,350.00 seized from Stegman's safe deposit box; and

- $100,000.00 found amongst five bobblehead doll boxes.

53

Wilson's motion for adjudication (ECF No. 628) will be granted with respect to those amounts of money, and the final order of forfeiture will be vacated under Rule 60(b). An amended final order of forfeiture with respect to that money will be entered to reflect those amounts are not forfeited to the government and will be turned over to Wilson.

Wilson did not satisfy his burden to show a right superior to the right of defendant in the remaining $338,227.00 that was forfeited by defendant to the government. Wilson's motion for adjudication (ECF No. 628) will, therefore, be denied with respect to $338,227.00.

Appropriate orders will be entered.


Date:   November 7, 2019                              BY THE COURT:

                                                      /s/ *Joy Flowers Conti*
                                                      Joy Flowers Conti
                                                      Senior United States District Judge